# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **VICKI MARIE JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 11-CV-6514** |
| | ) | |
| **v.** | ) | **Magistrate Judge Susan E. Cox** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Vicki Marie Jones, seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for a period of disability, disability insurance benefits, and Supplemental Security Income Benefits ("disability benefits") under the Social Security Act ("the Act").[2] The parties have filed cross-motions for summary judgment. Ms. Jones seeks a judgment reversing the Commissioner's final decision or remanding the matter for additional proceedings [dkt. 11], while the Commissioner seeks a judgment affirming his decision [dkt 13]. For the reasons set forth below, Ms. Jones's motion is denied and the Commissioner's motion is granted.

## I.    PROCEDURAL HISTORY

Vicki Marie Jones applied for disability benefits on November 2, 2007, alleging that she had

---

[1]On January 17, 2012, by the consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1(b), this case was assigned to this Court for all proceedings, including entry of final judgment [dkt. 6].
[2]42 U.S.C. §§416(I), 423, and 1381 *et seq.*

been unable to work since March 1, 2000, later amended to October 1, 2007, because of syncope,[3] carpel tunnel syndrome,[4] a herniated lumbar disk,[5] and depression.[6] This is Ms. Jones's fourth application for disability benefits. She applied unsuccessfully in 1995, 1997, and 2005.[7] Her current claim was denied on April 25, 2007.[8] Ms. Jones then filed a request for reconsideration on May 14, 2008,[9] which was denied on July 16, 2008.[10] On July 27, 2008, Ms. Jones requested a hearing before an Administrative Law Judge ("ALJ"),[11] which was granted on May 14, 2009.[12] The hearing took place before ALJ Janice M. Bruning on July 20, 2009,[13] but was continued while more evidence was collected.[14] The supplemental hearing was held on February 10, 2010.[15] Following the hearing, on June 9, 2010, the ALJ issued an unfavorable decision, concluding that Ms. Jones was not disabled within the meaning of the Act at any time after her application was filed.[16] The Appeals Council denied Ms. Jones's request to review the ALJ decision on August 26, 2011, meaning the ALJ's decision is the final decision of the Commissioner.[17] Ms. Jones filed this action on September 16, 2011.

## II.  FACTUAL BACKGROUND

[3]Syncope is "a temporary suspension of consciousness due to generalized cerebral ischemia" or "fainting." *Dorland's Illustrated Medical Dictionary* 1818 (32d ed. 2012).
[4]Carpal tunnel syndrome is a functional disturbance to, or pathological change in, the peripheral nervous system, often from overuse, characterized by abnormal pain and burning or tingling sensations in the fingers and hand, sometimes extending to the elbow. *Id.* at 1824, 1268, 1382.
[5]A herniated lumbar disk is a protrusion of part of an intervertebral disk, which may impinge on nerve roots, located in the back, between the chest and pelvis. *Id.* at 852, 1076, 1920.
[6]R. at 213.
[7]R. at 209-10.
[8]R. at 81-84.
[9]R. at 88-90.
[10]R. at 91.
[11]R. at 102.
[12]R. at 111.
[13]R. at 28.
[14]R. at 47.
[15]R. at 50.
[16]R. at 8.
[17]R. at 1.

Ms. Jones was born on October 12, 1956.[18] She is 5'4" tall and at the time of her current application for disability benefits, weighed approximately 196 pounds.[19] At the time of her application, she had been a smoker for thirty-five years.[20] Aside from the ailments she complains of in her application, she has had a hysterectomy and has sought treatment for many ailments, including respiratory issues, flu, food allergies, cavities, insect and spider bites, burns, rashes, knee pain, vaginal itching, and fatigue. We discuss Ms. Jones's medical record prior to her disability application, the period between her disability application and ALJ hearing, the testimony given at the ALJ hearing, and finally the ALJ's decision.

### A.    Medical Records Prior to Ms. Jones's Application

The medical records in the administrative record begin in 2002, when Ms. Jones was forty-five years old.[21] Although her disability application alleges both physical and mental health conditions, the only evidence of any mental health condition in her record prior to her application is one self-report of depression on July 29, 2003 at Rainbow Medical Clinic ("Rainbow Clinic").[22] Rainbow Clinic is located at Hesed House, the shelter where she was residing.[23] She was referred to a mental health clinic, but there is no evidence in the record that she followed up with the referral.[24] She claims to have been hospitalized in psychiatric facilities twice in the 1970s after being arrested and attempting suicide, but there is no evidence of this in the current record.[25] Therefore, in this section we discuss the physical complaints from her disability application: her wrist pain and

---

[18]R. at 208.
[19]R. at 337, 396.
[20]R. at 399.
[21]R. at 481.
[22]R. at 348.
[23]Rainbow Medical Clinic, http://www.hesedhouse.org/pads/rainbow.html.
[24]*Id.*
[25]R. at 58-59.

carpal tunnel syndrome, her syncope, and her back pain.

Ms. Jones fractured her right wrist on July 31, 2002.[26] It was put in a cast and she received follow-up treatment at an orthopedics clinic.[27] In July 2004, she reported pain in her right wrist and was later diagnosed with carpal tunnel syndrome in both wrists.[28] In 2007, the numbness from the carpal tunnel syndrome was "off and on and . . . not constant."[29]

On September 8, 2004, Ms. Jones presented at the Emergency Department ("ED") at Provena Mercy Medical Center in Aurora, Illinois ("Mercy") after fainting at a bus stop.[30] She underwent a battery of medical tests, including a series of cardiac tests, all of which came back normal.[31] Doctors noted that Ms. Jones was overweight and a heavy smoker, and advised her to stop smoking.[32] They also documented that she had reported a history of migraines and discharged her with Tylenol for migraines, the only medication she was prescribed.[33]

Ms. Jones had another syncopic episode while at work on November 21, 2005.[34] She was then taken to Edward Hospital in Naperville, Illinois.[35] Another round of cardiac tests were performed, which again were normal.[36] The next day, doctors noted that Ms. Jones was stable, diagnosed her with presyncope and hypertension, and discharged her.[37] On June 27, 2006, Ms. Jones presented at the Mercy ED complaining of dizziness and chest pain after climbing stairs, but she was

---

[26] R. at 481-89.
[27] R. at 481-89, 288-90.
[28] R. at 344, 331, 330.
[29] R. at 330.
[30] R. at 493.
[31] R. at 490-506.
[32] R. at 490, 492.
[33] R. at 490.
[34] R. at 305.
[35] R. at 294-305.
[36] R. at 301-304.
[37] R. at 305.

sent home the same day after the symptoms resolved themselves.[38]

Almost a year later, on March 22, 2007, Ms. Jones again presented at the Mercy ED complaining of lower back pain triggered by getting out of the shower.[39] Doctors prescribed pain medication and discharged her the same day.[40] Approximately six weeks later, Ms. Jones followed up at Rainbow Clinic.[41] She reported that she had a herniated disk and that she was in seven out of ten pain.[42] The clinic physician prescribed her additional pain medication.[43]

On October 3, 2007, two days after her alleged disability onset date, Ms. Jones reported to the physician at Rainbow Clinic that she had suffered another syncopic episode during the previous week.[44] She also said, at the clinic visit, that she had a small brain mass, but there is no evidence of this anywhere else in the medical record.[45] The physician noted that Ms. Jones needed an MRI of her brain, but no evidence of the MRI having been performed exists in the record.[46]

### B. Period between Ms. Jones's Application & the ALJ Hearing

On January 13, 2008, on her first Disability Report, Ms. Jones reported that she "pass[ed] out" because of her syncope.[47] She also stated that her back "act[ed] up," and that as a result, she could not stand up straight and was in "extreme pain."[48] Furthermore, she claimed that her hands were "constantly numb" and that she "drop[ped] things right out of [her] hands because [she did]

---

[38]R. at 422.
[39]R. at 412, 415.
[40]R. at 417.
[41]R. at 332.
[42]*Id.*
[43]*Id.*
[44]R. at 328.
[45]*Id.*
[46]*Id.*
[47]R. at 214.
[48]*Id.*

not know the tightness that [she had] to hold the object[s with]."[49]

The SSA referred Ms. Jones for multiple examinations as part of their initial determination. Her first was a psychological evaluation performed on March 26, 2008 by John L. Peggau, Psy.D., a clinical psychologist.[50] Dr. Peggau deferred a finding on any Axis I psychiatric disorder, but diagnosed her as having a personality disorder.[51] Additionally, he stated that during his consultation with Ms. Jones, she was "irritable and abrupt."[52] He reported that her reason for her behavior, as stated by her, was "just the fact that I'm here!"[53]

Five days later, Ms. Jones underwent a physical evaluation by Vinod G. Motiani, M.D., a state agency internal medicine physician.[54] Dr. Motiani diagnosed Ms. Jones with (1) syncope of undetermined etiology; (2) clinical history suggestive of carpal tunnel; (3) history of a herniated disk based on a previous MRI, but with a fairly good range of movement; and (4) depression.[55] Following this evaluation, Ms. Jones underwent a Physical Residual Functional Capacity ("RFC") Assessment by state agency physician Richard Bilinsky, M.D.[56] Dr. Bilinsky found that Ms. Jones was able to occasionally lift up to twenty pounds; frequently lift up to ten pounds; stand and/or walk for a total of about six hours in an eight hour work day; and sit for a total of about six hours in an eight hour work day. He found her unlimited in her ability to push and/or pull.[57] He also found no postural, manipulative, visual or communicative limitations.[58] He further found that Ms. Jones should avoid

---

[49]R. at 214.
[50]R. at 531.
[51]*Id.*
[52]R. at 529.
[53]*Id.*
[54]R. at 535.
[55]R. at 537.
[56]R. at 538-45.
[57]*Id.*
[58]R. at 540-42.

concentrated exposure to hazards.[59] Additionally, Dr. Bilinsky noted that he found Dr. Motiani's evaluation more credible than Ms. Jones's complaints.[60]

Following Dr. Bilinsky's evaluation, Ms. Jones underwent further evaluations to determine her psychiatric limitations, performed by David Gilliland, Psy.D. on April 19, 2008.[61] Dr. Gilliland's sole diagnosis was a personality disorder.[62] He found Ms. Jones to be: mildly limited in her activities of daily living; moderately limited in maintaining social functioning; and moderately limited in maintaining concentration, persistence, or pace.[63] Dr. Gilliland also performed an RFC assessment, in which he found Ms. Jones to be: moderately limited in her ability to understand and remember detailed instructions; moderately limited in her ability to carry out detailed instructions; and moderately limited in her ability to interact appropriately with the general public.[64] Following these assessments, Ms. Jones was determined by the SSA not to be disabled.[65]

On May 1, 2008, approximately a week after the SSA's initial determination, Ms. Jones presented at Aunt Martha's Youth Service Center and Health Center ("Aunt Martha's") with lower back pain.[66] She was diagnosed with a lumbar strain and prescribed pain medication.[67] This complaint was reflected on the Disability Report she completed when she filed for reconsideration.[68] On this Disability Report, Ms. Jones noted that she had "more back pain" and that the pain was "constant."[69] However, the SSA again determined that Ms. Jones was not disabled, without ordering

---

[59]R. at 542.
[60]R. at 545.
[61]R. at 546-63.
[62]R. at 546.
[63]R. at 556
[64]R. at 560-61.
[65]R. at 81.
[66]R. at 567.
[67]*Id.*
[68]R. at 89, 246.
[69]R. at 246.

any subsequent assessments.[70] Ms. Jones then requested an ALJ hearing.[71] Incidentally, Ms. Jones submitted two additional medical records obtained after this time, but they were not related to her disability claim.[72]

### C.     First ALJ Hearing

On July 30, 2009, ALJ Janice M. Bruning conducted a hearing regarding Ms. Jones's disability claim.[73] Ms. Jones was represented by counsel.[74] The ALJ heard testimony from Ms. Jones and her counsel.[75] Vocational Expert ("VE") Edward Pagella was present but did not testify because the hearing had to be continued in order to collect additional evidence regarding Ms. Jones's mental health.[76]

Ms. Jones's counsel started the hearing by stating that she had requested, but not received, a consultative evaluation in order to administer a Minnesota Multiphasic Personality Inventory ("MMPI"), a depression test, on Ms. Jones.[77] Ms. Jones began her testimony by stating that since she fractured her right wrist, her hand "still goes numb," but that she can still use her right hand.[78] Similarly, she feels numbness in her left hand but can still use it.[79] Regarding her back pain, she testified that she was not undergoing any physical therapy treatment and was treating the pain with fifty Tylenol pills per week.[80] She stated that she had passed out two weeks prior, which was the first

---

[70]R. at 93.
[71]R. at 102.
[72]R. at 570-71.
[73]R. at 26-47.
[74]R. at 28.
[75]*Id.*
[76]R. at 28, 46.
[77]R. at 29.
[78]R. at 32.
[79]R. at 36.
[80]R. at 33.

time since 2007, but did not say what caused her to pass out.[81] In that time, she had suffered occasional dizzy spells, but did not go to the hospital for them.[82] In terms of her depression, Ms. Jones testified that she was not seeing a psychiatrist, psychologist, or mental health specialist because in 2005 she was told that she "wasn't ill enough for their services."[83]

Ms. Jones stated that she could walk for approximately four blocks without sitting down, but could not sit for more than fifteen minutes without getting up and moving around because her legs "start jumping."[84] She claimed to be able to lift fifteen pounds with her left hand but only less than three pounds with her right hand.[85] She stated that she does not have any difficulty climbing stairs, but that she cannot get back up once she bends down.[86] In terms of balance, she "seem[s] to tilt to one side," but no doctor has recommended a cane or other assistive device.[87] She testified that she was able to take care of her personal care, prepare meals, drive, go to the grocery store, clean, and do housework.[88] She said that she does not get along with other people at her shelter because they irritate her, and that she only talks with one of her children regularly because the others "don't think [she is] a good mom."[89] She also reported that she does sudoku puzzles, uses the computer at the library, and goes to the park to talk to and feed the animals.[90]

In terms of work, Ms. Jones testified that she worked part-time at an auto garage for the first five months of 2009 and was looking for any work she could get.[91] She was fired from her two

---

[81]R. at 33, 34.
[82]R. at 34.
[83]R. at 34-35.
[84]R. at 35.
[85]*Id.*
[86]*Id.*
[87]R. at 35-36.
[88]R. at 37-38.
[89]R. at 38.
[90]R. at 39, 41.
[91]R. at 40-41.

previous jobs for violence and not getting along with other employees.[92] If the 1970s, after being fired from one job, she was arrested, which led to her being hospitalized for a year in a psychiatric hospital.[93] She testified to having other encounters with the police as a result of her violence in the past, including striking the new girlfriend of an ex-boyfriend with a tire iron.[94] The more recent incident Ms. Jones testified to involved a minor altercation with a resident at the shelter and her husband intervened to break it up.[95]

Ms. Jones was still living at Hesed House at the time of her hearing.[96] She volunteered in the kitchen, where her husband was the cook, washing trays and chopping food.[97] Ms. Jones stated that she could do this for thirty minutes before her hands got numb.[98] After this testimony, Ms. Jones's counsel stated that she wanted to have a consultant administer the MMPI on Ms. Jones because of Dr. Motiani's diagnosis of depression.[99] The ALJ agreed, and said she would order both the MMPI and the Beck Depression Inventory ("Beck"), another depression test.[100] She then continued the hearing.[101]

### D.    Second Psychiatric Consultative Examination

The SSA referred Ms. Jones back to Dr. Peggau for the additional assessment.[102] Dr. Peggau administered the MMPI and found that Ms. Jones's profile "showed elevations in almost every scale,

---

[92]R. at 42.
[93]R. at 43.
[94]R. at 43-44, 45.
[95]R. at 44.
[96]R. at 44. The transcript says "Hessick House," but we believe this to be a typo. Our review shows that there are no shelters called Hessick House in the Chicagoland area, whereas Hesed House is a shelter in Aurora, Illinois, where she is documented as having received treatment at the Rainbow Clinic.
[97]R. at 44, 41.
[98]R. at 45.
[99]R. at 46.
[100]*Id.*
[101]*Id.*
[102]R. at 576.

[indicating that Ms. Jones's psychological profile] is somewhat passive-dependent, immature, narcissistic, and self-indulgent."[103] He ultimately concluded his overall evaluation by stating that Ms. Jones does not have any psychiatric disorders other than personality disorder with borderline features.[104] He did not administer the Beck. Unlike his first session with Ms. Jones, Dr. Peggau reported that during this session, "it was easy to establish rapport with [her]."[105]

Dr. Peggau also completed a form to assist the ALJ in determining Ms. Jones's Mental RFC.[106] He concluded that Ms. Jones's ability to understand, remember, and carry out instructions were not affected by her impairment.[107] Additionally, he found that Ms. Jones had mild limitations in her ability to interact appropriately with the public, with supervisors, and with co-workers, and in her ability to respond appropriately to usual work situations and to changes in her routine work setting.[108] There were no other capabilities affected by Ms. Jones's impairment.[109]

### E.    Supplemental ALJ Hearing

The ALJ hearing resumed on February 10, 2010.[110] Ms. Jones was present, as were her counsel, VE Glee Ann Kehr, and Medical Expert ("ME") Mark Oberlander, Ph.D. To begin the supplemental hearing, Ms. Jones's counsel testified that there was nothing missing from the file that is essential to the case.[111] She added that Ms. Jones had been given Ibuprofen for back pain, but was not seeing a physician for it.[112] Therefore, she did not have any corresponding medical

---

[103]R. at 581.
[104]R. at 581-82.
[105]*Id.*
[106]R. at 576-78.
[107]R. at 576.
[108]R. at 577.
[109]*Id.*
[110]R. at 50.
[111]R. at 50.
[112]R. at 51.

documentation.[113] During the hearing, Ms. Jones, Ms. Kehr, and Dr. Oberlander all testified.

### 1.    Ms. Jones's Testimony

The ALJ began by examining Ms. Jones.[114] Ms. Jones testified that the only vocational training she had was a certificate in forklift driving and that she was not working at the time of the hearing.[115] She testified that she was collecting unemployment and still searching for and applying for jobs.[116] To this, the ALJ noted that "when you collect unemployment, you are basically telling someone you are ready, willing, and able to work."[117] Ms. Jones did not disagree, stating that she was looking for "[a]nything that can support me and my husband."[118] In terms of her activities, Ms. Jones testified that she helps her husband cook at her shelter and that she fishes once per week in the summertime.[119]  Regarding her health, Ms. Jones testified that she was not currently receiving any mental health treatment and that other than the Ibuprofen she took for her back pain, she had not received any medical treatment since the first hearing.[120]

Next, Ms. Jones's counsel examined her.[121] Ms. Jones testified that at the shelter, she slept in a room with twenty or thirty other women.[122] A typical day involved getting up, washing up or taking a shower, brushing her teeth and hair, going out to smoke a cigarette, then going to help in the kitchen.[123] This usually involved straightening the shelves for an hour, then helping her husband

---

[113]*Id.*
[114]R. at 51-54.
[115]R. at 52.
[116]R. at 52, 54.
[117]R. at 54.
[118]*Id.*
[119]R. at 53-54.
[120]R. at 53.
[121]R. at 55-62.
[122]R. at 55.
[123]*Id.*

make lunch.[124] She stated that she did not like to eat lunch with the other shelter residents because she did not like being around them.[125] Instead, she would eat lunch in the kitchen with her husband and do sudoku puzzles.[126] In the afternoon, she would not participate in group activities at the shelter.[127] She did eat dinner in the dining room, because "she had to," but then would go to bed after dinner.[128]

Ms. Jones then testified that she had previously punched another resident of the shelter.[129] The police were not called and she had not had any other violent interactions with residents in her seven years at the shelter.[130] She recounted that outside of the shelter, she had hit her ex-husband in 1990, and retold the testimony, from the first hearing, of stabbing a man in the throat with a pool cue in 1976, after which she was arrested and spent eleven months at Elgin Mental Hospital.[131] She also testified that she had been hospitalized in 1978 after attempting suicide.[132] She stated that in 1978, she also punched a coworker's teeth out.[133] She testified that she does not like people, apart from her husband and children, because they irritate her and cause her to lose her temper.[134] She said the other residents at the shelter bothered her because they "are loud and obnoxious" and "act like little children."[135]

In terms of her health, she testified that she sought psychiatric treatment in 2004 but that they

---

[124]R. at 56.
[125]R. at 56.
[126]Id.
[127]R. at 57.
[128]Id.
[129]R. at 58.
[130]R. at 58.
[131]R. at 58-59.
[132]R. at 59.
[133]Id.
[134]R. at 60.
[135]Id.

had told her that she "wasn't ill enough" for treatment.[136] She claimed that she had pain in her back from her herniated disc, that was irritated by "overexertion" and sometimes swells up "by itself."[137] She stated that her wrists were currently numb, which was sometimes caused by using a knife in the kitchen.[138] Finally, she testified that she thought that "sometimes" she could work full-time.[139]

## 2.      The ME's Testimony

Next, the ME testified that he had reviewed Dr. Peggau's two reports and that there were no additional treating sources in Ms. Jones's file.[140] The ME questioned the validity of Dr. Peggau's MMPI exam, stating that her scores should have resulted in his finding her psychological profile to be passive-dependent, mature, narcissistic, and self-indulgent, but not immature, as Dr. Peggau found.[141] The ME proceeded to give his own assessment of Ms. Jones's functional limitations.[142] He found her capacity to engage in appropriate activities of daily living to be mildly impaired.[143] He found her capacity to engage in appropriate social interactions to be moderately impaired.[144] He found her capacity to concentrate and pay attention to be moderately impaired.[145] He opined that there was no evidence as to any periods of decompensation or deterioration, as defined by SSA regulations.[146] Further, he found C-criteria not to apply. He also found that Ms. Jones, at the time of the hearing, retained the mental and cognitive motivational capacity to engage in simple, repetitive work activities with allowance being made for less than frequent contact with co-workers,

---

[136]R. at 61.
[137]R. at 61.
[138]R. at 62.
[139]*Id.*
[140]R. at 63.
[141]R. at 64.
[142]*Id.*
[143]R. at 65.
[144]*Id.*
[145]*Id.*
[146]*Id.*

supervisors, and the public.[147]

In response to Ms. Jones's counsel, the ME testified that he would guess that Ms. Jones's lifestyle and activities represent a "very simple constricted life."[148] Also, he stated that although very few demands are placed on her socially, Ms. Jones cannot avoid social interactions based on the makeup of her shelter, although she is permitted to spend her day isolated in the kitchen.[149] Next, in regards to Dr. Peggau's finding that an individual with Ms. Jones's psychological profile would have difficulty being relied upon in terms of employability because of her sense of responsibility, the ME testified that the finding was inconsistent with Dr. Peggau's finding that Ms. Jones was cooperative and only mildly impaired in the social domain in general.[150] As a result, the ME testified that he would take Ms. Jones's MMPI results "with a grain of salt."[151]

### 3.    The VE's Testimony

Next, the VE testified, having stated that she had reviewed the exhibits in Ms. Jones's file and heard the testimony regarding her work history.[152] She stated that Ms. Jones has had several jobs that would fall under the category of machine operator, unskilled work, ranging from light to medium.[153] Additionally, she has done some work as a forklift operator, which would be medium-low and semiskilled, and as a housekeeper, which is light and unskilled.[154] The VE testified that Ms. Jones could perform a housekeeping job, not as she previously performed it, but as it is often performed in the national economy.[155] There would be approximately 3,200 such positions

---

[147]R. at 65.
[148]R. at 66.
[149]Id.
[150]R. at 67.
[151]R. at 68.
[152]R. at 69.
[153]R. at 70.
[154]Id.
[155]Id.

available.[156] Additionally, Ms. Jones could function in a sorting position.[157] Accommodating for a position that does not involve operating a forklift leaves approximately 1,900 jobs available.[158] Ms. Jones could also perform a hand packaging job, of which there would be approximately 1,800 jobs available.[159] If the additional accommodation were to be made to preclude contact with the public, only the sorting and hand packaging jobs would be available.[160] The reductions in numbers based on specific accommodations to suit Ms. Jones were based on the VE's professional judgment.[161]

In response to questions from Ms. Jones's counsel, the VE testified that she did not have statistical data available to her to verify her estimated reductions to accommodate Ms. Jones's limitations.[162] Additionally, she testified that in the jobs mentioned, an individual could not miss more than one day per month, without eventually being terminated.[163] While at work, an employee would be expected to be on-task, functioning, and productive as much as ninety percent of the time.[164] The VE testified that if an individual had yelling matches with their boss, they would ultimately be terminated.[165] Following the VE's testimony, the ALJ concluded the hearing.[166]

F.    **ALJ's Decision**

In an opinion issued on June 9, 2010, the ALJ concluded that Ms. Jones was not disabled within the meaning of the Act at any time on or after October 1, 2007, the alleged disability onset

---

[156]R. at 70.
[157]*Id.*
[158]*Id.*
[159]R. at 71.
[160]*Id.*
[161]R. at 71-72.
[162]R. at 73.
[163]*Id.*
[164]R. at 73-74.
[165]R. at 74.
[166]R. at 75.

date.[167] Although the ALJ found that Ms. Jones met the insured status requirements of the Act through October 23, 2009, the ALJ opined that Ms. Jones was unable to establish that she has a disability that would prevent her from working the type of position that she held before the impairment or any other kind of gainful work generally available in significant numbers within the national economy, for one year or more, as required by SSA regulations.[168]

SSA regulations prescribe a sequential five-part test for ALJs to use in determining whether a claimant is disabled.[169] The ALJs' first step is to consider whether the claimant is presently engaged in any substantial gainful activity, which would preclude a disability finding.[170] In the present case, the ALJ determined that Ms. Jones had not engaged in substantial gainful activity since October 1, 2007, her application date.[171] The second step is for the ALJ to consider whether the claimant has a severe impairment or combination of impairments.[172] In the present case, the ALJ concluded that Ms. Jones had the medically determinable severe impairments of lumbar strain, borderline cardiac enlargement, and personality disorder, based on evidence in the record.[173]

The ALJ's third step is to consider whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity.[174] In the present case, the ALJ determined that Ms. Jones's impairments did not meet or medically equal a listed impairment, even in combination, under 20 C.F.R. Part 404, Subpart P, Appendix 1.[175] She reviewed listings 1.04 (Disorders of the Spine), 4.01 (Cardiovascular System), and 12.08

---

[167]R. at 12.
[168]R. at 13, 42 U.S.C. § 423(d)(1)(A).
[169]20 C.F.R. § 404.1520(a)(4).
[170]Id. § 404.1520(a)(4)(I).
[171]R. at 13.
[172]20 C.F.R. § 404.1520(a)(4)(ii).
[173]R. at 14.
[174]20 C.F.R. § 404.1520(a)(4)(iii).
[175]R. at 15.

(Personality Disorders).[176] Based on the lack of objective medical evidence, the ALJ did not consider Ms. Jones's other symptoms that were present in her medical record (her visual impairments, wrist discomfort, knee pain, headaches, bronchitis, and syncope) to be severe impairments.[177]

With respect to Ms. Jones's lumbar strain, the ALJ concluded that there were no objective clinical findings of any nerve root or spinal cord compressions to suggest that the Listing requirements were met.[178] The ALJ also pointed out that Ms. Jones is able to ambulate effectively.[179] Regarding Ms. Jones's cardiac enlargement, the ALJ concluded, again, that there were no objective clinical findings to satisfy the listing requirements.[180] Similarly, the ALJ found that Ms. Jones's personality disorder did not meet the requirements of listing 12.08.[181] This listing requires that the claimant be evaluated as having marked limitations in at least two of the following: activities of daily living; maintaining social functioning; maintaining concentration persistence of pace; or, alternatively, at least three episodes of decompensation within a year, or once every four months, each lasting at least two weeks.[182] Ms. Jones was only evaluated as having mild restrictions in terms of daily living and moderate restrictions in terms of maintaining social functioning and concentration, persistence, and pace.[183] Also, she had no documented episodes of decompensation.[184] As such, her symptoms did not meet the listing requirements.[185]

Between the third and fourth steps, the ALJ determines the claimant's residual functional

---

[176] R. at 15.
[177] Id.
[178] Id.
[179] Id.
[180] Id.
[181] Id.
[182] 20 C.F.R. § 404 App. 1..
[183] R. at 15.
[184] Id.
[185] Id.

capacity ("RFC"), which is the claimant's ability to regularly complete physical and mental work activities despite mental impairments.[186] In her RFC analysis, the ALJ considers all of the claimant's impairments, not only severe ones.[187] She follows a two-step process when she must assess subjective complaints.[188] First, she determines whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.[189] If so, the ALJ then evaluates the intensity, persistence, and limiting effects of a claimant's symptoms on her ability to do basic work activities.[190] The ALJ need only consider the subjective symptoms to the extent that they can reasonably be accepted as consistent with the objective medical evidence and other evidence.[191] If, after this process, the ALJ determines that the claimant's RFC makes her able to perform her past work, the claimant is found not to be disabled.[192]

In the present case, the ALJ determined that Ms. Jones had the RFC to perform light work with no climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps or stairs; avoiding concentrated exposure to work hazards such as moving machinery or unprotected heights; involving unskilled, simple repetitive tasks with no contact with the public and only occasional contact with co-workers and supervisors.[193] The ALJ found that Ms. Jones's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible.[194]

---

[186]20 C.F.R. § 404.1520(e).
[187]*Id.* § 404.1529(c)(4).
[188]*Id.* § 404.1529.
[189]*Id.* § 404.1529(b).
[190]*Id.* § 404.1529(c).
[191]*Id.*
[192]*Id.* § 404.1520(a)(4)(iv).
[193]R. at 16.
[194]R. at 17.

The ALJ first addressed Ms. Jones's complaints of mental illness.[195] In discrediting these subjective complaints, the ALJ noted that although Ms. Jones had reported to healthcare providers that she had been depressed and received mental health treatment in the past, there were no records of referrals or treatment in the current record, other than the two SSA referred consultative examinations.[196] Furthermore, Ms. Jones had not taken any psychiatric medication since 1977 and there is no mention of her suicide attempt in her treatment record.[197] The ALJ also points out that the ME opined that Ms. Jones's mental impairments would not stop her from working.[198] The only clinical evidence to contradict this opinion was the result of the MMPI test, which the ME specifically addressed, stating that the results were not reliable.[199] The ALJ also discredited Ms. Jones's assertion that she could not maintain focus and attention or be around others.[200] The ALJ reasoned that Ms. Jones's purported inability to remain focused was not marked, since she was able to focus on applying for jobs, by reading newspaper ads, using the internet, and applying in person.[201] Likewise, although she was purportedly unable to be around others, Ms. Jones was able to prepare meals for others and sleep in the same room as many other women.[202] Furthermore, she had been able to do so for seven years without reports of any incidents in that setting.[203]

The three physical impairments that Ms. Jones claimed were disabling were her syncope, her wrist pain, and her back pain. The ALJ discredited her testimony as to how limiting all three of these

---

[195]*Id.*
[196]*Id.*
[197]*Id.*
[198]R. at 18.
[199]R. at 19.
[200]*Id.*
[201]R. at 19, 18.
[202]R. at 19.
[203]*Id.*

complaints were.[204] The ALJ reasoned that state agency consultant Dr. Motiani indicated that Ms. Jones's lower back pain did not radiate to her legs and could be treated with medication, and that she had a good range of motion.[205] As to Ms. Jones's carpal tunnel syndrome, the ALJ noted that she displayed good grip strength and normal fine and gross manipulation using her wrists.[206] As to the syncope, the ALJ pointed out that doctors were unable to identify the medical reason for the fainting and that there were no reported episodes of syncope after the alleged disability onset date.[207]

The ALJ then proceeded to the fourth step, which is to determine whether the claimant is able to perform her past relevant work.[208] This involves comparing the claimant's RFC to the requirements of her past work.[209] In the present case, the ALJ concluded that Ms. Jones was not able to perform her past work based on her RFC.[210] This is because Ms. Jones's RFC was limited to light work without moving machinery and without contact with the public, while her past work as a fork-lift operator involved the use of machinery and her past work as a housekeeper involved some interaction with the public.[211]

As such, the ALJ was required to move on to the fifth step of the test, which is to evaluate whether the claimant is able to perform any other work existing in significant numbers in the national economy.[212] The ALJ determined that, considering Ms. Jones's age, education, work experience, and RFC, that jobs did exist in significant numbers in the national economy that she

---

[204]R. at 17.
[205]Id.
[206]Id.
[207]R. at 17, 14.
[208]20 C.F.R. § 404.1520(a)(4)(iv).
[209]Id.
[210]R. at 19.
[211]Id.
[212]20 C.F.R. § 404.1520(a)(4)(v).

could perform.[213] Based on the VE's testimony, the ALJ found that Ms. Jones could perform jobs in the Chicagoland area as a sorter and a hand packager.[214] Because there were jobs that Ms. Jones could perform, she was not disabled, as defined by the Act.[215]

As to whether Ms. Jones could perform other work, in her credibility finding the ALJ pointed out that Ms. Jones had applied for and received unemployment benefits, which she was still collecting at the time of the hearing.[216] The ALJ judged this to be reflective of her documented "feeling of entitlement" and noted that Ms. Jones has also applied for disability benefits at least three times prior to the current application.[217]

## III.     STANDARD OF REVIEW

The court reviews the ALJ's findings of law *de novo,* but must sustain the Commissioner's findings of fact if they are supported by substantial evidence and are free of legal error.[218] Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[219] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner and not the court.[220] Although the ALJ need not address every piece of evidence or testimony presented, he must adequately discuss the issues and build an accurate and logical bridge from the evidence to the conclusion.[221] The court must conduct a critical review of the evidence and will not uphold the ALJ's

---

[213]R. at 20.
[214]*Id.*
[215]*Id.*
[216]R. at 18.
[217]*Id.*
[218]*White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999), 42 U.S.C. § 405(g).
[219]*McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011).
[220]*Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987)).
[221]*Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir.2010), *McKinzey*, 641 F.3d at 889.

decision if it lacks evidentiary support or an adequate discussion of the issues.[222]

## IV.    ANALYSIS

Ms. Jones argues that the ALJ's decision must be reversed or remanded because the ALJ erred by (1) failing to develop a full and fair record of Ms. Jones's subjective complaint of depression; (2) failing to address the inconsistencies in Dr. Peggau's consultative examinations; and (3) concluding that Ms. Jones's ability to live in a homeless shelter was indicative of less than marked social functioning.[223] In examining these claims, we find no error by the ALJ. The arguments are addressed in turn.

### A.    The ALJ's development of the record was proper.

The first issue centers around the fact that when the ALJ adjourned the initial hearing, she said she would "have [Dr. Peggau administer] the Beck and the MMPI . . . at the same time."[224] However, Dr. Peggau only administered the MMPI, not the Beck. The ALJ still found Ms. Jones's depression not to be disabling under the Act. The question, therefore, is whether the ALJ erred in not reordering the Beck. Ms. Jones offers us very little argument. She asserts that she could not afford psychiatric treatment but that the Beck would have proven that her depression was disabling.[225] Therefore, she claims the ALJ failed in her duty to develop the record by "not delivering upon her promise" to order the Beck.[226] The Commissioner responds that the absence of the depression testing was not prejudicial and does not warrant remand.[227]

In arguing that the ALJ did not fulfill her duty to develop a full and fair record, Ms. Jones

---

[222]*Clifford v. Apfel*, 227 F.3d 863, 839 (7th Cir.2000).
[223]Pl. Mot. at 8-11, dkt. 11.
[224]R. at 46.
[225]Pl. Mot at 9, dkt. 11.
[226]*Id.*
[227]Def. Mot. at 5, dkt. 13.

cites two cases: *Thompson v. Sullivan* and *Dyson v. Massanari*.[228] Both of these cases are distinguishable because they involve *pro se* litigants.[229] An ALJ's duty to develop a full and fair record is higher when a claimant appears *pro se* in a hearing.[230] In Ms. Jones's case, because she was represented at her hearing, she bore the "primary responsibility for producing medical evidence demonstrating the severity of [her] impairments."[231] We note that at the start of the supplemental hearing, the ALJ asked Ms. Jones's counsel whether there was "anything missing from the file that [she] believe[d was] essential to this case," to which she replied "there isn't judge."[232]

In terms of whether the ALJ should have re-ordered the Beck, an ALJ "may order a consultative examination when 'the evidence as a whole is insufficient to support a determination or decision on [the] claim.'"[233] Furthermore:

> the need for additional tests or examinations will normally involve a question of judgment, and we generally defer to the ALJ's determination whether the record before her has been adequately developed. Particularly in counseled cases, the burden is on the claimant to introduce some objective evidence indicating that further development is required. Moreover, on appeal, in order to obtain relief on this ground the claimant must show prejudice by pointing to specific medical evidence that was omitted from the record.[234]

The ALJ is also not required to go on a "fishing expedition" for new evidence.[235] Requiring the ALJ to "obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on . . . would be a formula for paralysis."[236] As

---

[228]*Id.*; *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991); *Dyson v. Massanari*, 149 F. Supp. 2d 1018 (N.D. Ill. 2001).
[229]*Thompson*, 933 F.2d at 583; *Dyson*, 149 F. Supp. 2d at 1022.
[230]*Thompson*, 933 F.2d at 585 (citing *Smith v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)).
[231]*Flener* ex rel. *Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004).
[232]R. at 50.
[233]*Wilcox v. Astrue*, No. 12-1484, 2012 WL 3590894 (7th Cir. Aug. 22, 2012) (citing 20 C.F.R. § 416.919a(b)).
[234]*Wilcox*, 2012 WL 3590894.
[235]*Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991).
[236]*Scheck* , 357 F.3d at 702 (quoting *Kendrick*, 998 F.2d at 456).

long as the ALJ supports her findings with substantial evidence from the record, building a logical bridge between the existing evidence and her findings, her decision is upheld.[237]

Here, the ALJ felt she had sufficient objective evidence to determine that Ms. Jones's depression was not disabling. If the evidence was substantial, such that a reasonable mind might accept it as adequate to support the ALJ's conclusion, the omission of the Beck test was prejudicial. If the evidence the ALJ relied on, however, was not substantial, then the omission of the Beck test was prejudicial. To help guide our analysis on the issue, we must look to Listing 12.04, to see what the substantial evidence needs to demonstrate. To meet Listing 12.04, Ms. Jones's depression must result in two "paragraph B" limitations, or one paragraph B limitation and a "paragraph C" factor.[238] The paragraph B limitations are: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.[239] To even be assessed under paragraph C listings, Ms. Jones must be able to demonstrate, a "medically documented history of a chronic organic mental disorder of at least [two] years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support. . . ."[240]

Accordingly, for her depression to be disabling, Ms. Jones needs to show not only clinical evidence that she was depressed, but also that the depression had a limiting effect on daily functioning that would affect her ability to work (the paragraph B limitations) or that she had an

---

[237]*McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011).
[238]20 C.F.R. § 404, Subpt. P, App. 1 § 12.04.
[239]*Id.*
[240]*Id.*

extensive, documented history of depression (the paragraph C factors).[241] For the omission of Beck test to be relevant, then, we must determine whether Ms. Jones would be able to meet the Listing requirements even if the Beck test did indeed show that she was severely depressed.

Starting with the paragraph C factors, the record does not support that Ms. Jones suffered from a "medically documented history of a chronic organic mental disorder of at least [two] years' duration." The ALJ notes that "until [Ms. Jones] was scheduled for a psychological consultative examination by DDS, the only mention or diagnosis of any mental impairment, whatsoever, in any of [her] medical records, occurs only because the claimant's self report of depression in July 2003."[242] To counter this, Ms. Jones argues that she was medically indigent and could not afford psychiatric treatment.[243] While we are fully cognizant that the Seventh Circuit disapproves of ALJs making credibility determinations about claimants' subjective symptoms based on their inability to pay for treatment,[244] we note that Ms. Jones has a significant history of going to the ED for a variety of ailments, including respiratory issues, flu, food allergies, cavities, insect and spider bites, burns, rashes, knee pain, vaginal itching, and fatigue. Not only does this suggest that her "medical indigence" was not a general barrier to her seeking care, but none of these hospitalizations resulted in any documentation indicating that Ms. Jones was suffering from any mental disorder or that psychiatric consults were necessary. As the ALJ points out, the one ED visit where a psychiatric evaluation was made, it was negative.[245] As such, we find no error in the ALJ using Ms. Jones's lack

---

[241]*Larson v. Astrue*, 615 F.3d 744, 747 (7th Cir. 2010) (discussing 20 C.F.R. § 404, Subpt. P, App. 1 § 12.04).
[242]R. at 17.
[243]Pl. Mot. at 9, dkt. 11.
[244]*Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)(finding that "infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." But also noting the requirement that the ALJ explore the claimant's reasoning for lack of treatment).
[245]R. at 17.

of psychiatric treatment in finding that the paragraph C factors were not met. Paragraph C requires a two-year, documented history of a chronic, organic mental disorder. A reasonable mind would find that Ms. Jones's record contained no such history. Ms. Jones's appeal relies, then, on whether she was sufficiently limited under Listing 12.04's paragraph B.

Before we analyze whether Ms. Jones is sufficiently limited under paragraph B, we first note that she has not challenged any of the ALJ's limitation findings. In fact, she only specifically challenges state agency psychologist Dr. Gilliland's opinion that she was *mildly* impaired in social functioning.[246] However, the ALJ found that she was *moderately* impaired in this arena.[247] Because Ms. Jones raises this issue, we will address it first. During the supplemental hearing before the ALJ, Ms. Jones emphasized her violent tendencies both in the past and since living at the shelter.[248] She testified that she had been arrested in 1976 and 1978 for violence and hospitalized in a psychiatric facility as a result of the second arrest.[249] She also raised that she had previously punched another resident of the shelter.[250] We interpret this as an attempt to show the extent of her limitations in social functioning. The ALJ determined, however, that this constituted a moderate social limitation rather than a marked social limitation.[251] The ALJ reasoned that despite her violent temperament, Ms. Jones had been able to live with others in the shelter despite the one incident.[252] She had not been hospitalized for any psychiatric condition or arrested for violence since she had been at the shelter.[253] Additionally, she had been able to go grocery shopping and visit the library.[254] We must

---

[246]Pl. Mot. at 5.
[247]R. at 15.
[248]R. at 58-59.
[249]*Id.*
[250]R. at 58.
[251]R. at 18.
[252]*Id.*
[253]R. at 18.
[254]*Id.*

respect the ALJ's factual determination. In doing so, we recognize that an individual would not necessarily have to be hospitalized or arrested to fall into the category of a marked social limitation. However, Ms. Jones opened this Pandora's box by raising the points in her testimony. The problem she faces is that the arrests and hospitalizations occurred almost four decades ago. Since then, she has no evidence of any psychiatric treatment. Most importantly, there is no evidence in the current record to suggest that she is markedly limited in her social functioning. Because the current record is what the ALJ had to work with, her findings as to Ms. Jones's limitations in social functioning were supported by substantial evidence.

Even if we assumed, for the sake of argument, that Ms. Jones did have marked limitations in her social functioning, this would still not be enough to meet Listing 12.04's paragraph B requirements, which require one other marked limitation for a finding of disability. Ms. Jones has not challenged any of the ALJ's other paragraph B limitation determinations, which the ALJ addressed individually, as follows. In relation to Ms. Jones's activities of daily living, the ALJ found her to be mildly restricted, citing that she assists her husband in the shelter kitchen, cooks, does laundry, does dishes, drives, and attends to personal hygiene.[255] Regarding Ms. Jones's concentration, persistence, and pace, the ALJ found that Ms. Jones had moderate difficulties, pointing to her ability to do chores, drive, do puzzles, and use the computer.[256] Finally, as to episodes of decompensation, the ALJ found that Ms. Jones had not experienced any that have been of extended duration.[257] These findings are in line with both the ME's testimony[258] and Dr. Gilliland's

---

[255]R. at 15.
[256]*Id.*
[257]*Id.*
[258]R. at 15, 65.

opinion.[259]

In coming to her findings, the ALJ discredited Ms. Jones's subjective accounts of the limiting effect her depression on her functioning.[260] In doing so, the ALJ noted that Ms. Jones is a serial benefits filer who has been documented as "having a feeling of entitlement."[261] The ALJ also refered to the fact that Ms. Jones has applied for disability benefits at least four times.[262] Furthermore, she  elicited testimony from Ms. Jones during the hearings that Ms. Jones was still collecting unemployment and applying for jobs, noting in her opinion that the fact that she was still searching for jobs was "contrary to her assertion that she cannot maintain focus and attention or that she cannot be around others."[263] While the SSA does not forbid individuals collecting unemployment benefits from filing for disability, the Seventh Circuit has held that ALJs are justified in using this fact as part of their reasoning in denying benefits.[264] We find that the ALJ did not err in discrediting the credibility of Ms. Jones's subjective accounts of limitations as they pertain to the paragraph B limitations.

After analyzing the listing requirements, we find that the ALJ's determination that Ms. Jones did not meet the requirements for Listing 12.04 was supported by substantial evidence. We are not finding that Ms. Jones was not depressed. A remand for a Beck test may prove that she is. However, a showing of depression is not all that is required to meet Listing 12.04. The ALJ adequately addressed the Listing's requirements in finding that Ms. Jones did not meet them.

**B.      The ALJ properly addressed the inconsistences between Dr. Peggau's two reports.**

---

[259]R. at 556.
[260]R. at 17.
[261]R. at 18.
[262]*Id.*
[263]R. at 19.
[264]*Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005).

Ms. Jones next argues that the ALJ erred by failing to address inconsistencies between Dr. Peggau's two reports.[265] After Dr. Peggau's first interview with Ms. Jones, he reported that Ms. Jones was "very irritable, terse, and rude" and "extremely arrogant, narcissistic, and quite antisocial" with "very poor social skills."[266] After the second visit, Dr. Peggau noted that she was "only mildly impaired in the social domain, in general."[267] Ms. Jones contends that by failing to address this inconsistency, the ALJ failed to articulate at some minimal level her analysis of the evidence to permit an informed review, rendering the denial of benefits unacceptable.[268]

We find that the two comments are not inconsistent. It is perfectly reasonable that Ms. Jones may have presented herself differently at the two visits. Dr. Peggau would then come to different conclusions about her social functioning limitations. However, even if we did entertain the argument that the inconsistency exists, the ALJ adequately explained her reasons for accepting the two reports and this determination is supported by substantial evidence. If the two reports presented conflicting evidence, "weighing [it] is exactly what the ALJ is required to do."[269] The ALJ weighed not only Dr. Peggau's two reports, but also the absence of evidence from treating physicians and the ME's testimony. She ultimately chose not to fully adopt either of Dr. Peggau's reports and instead adopted the testimony of the ME, specifically noting that the ME had considered both of Dr. Peggau's reports.[270] The Court is not permitted to re-weigh this evidence.[271]

**C.      The ALJ's reference to Ms. Jones's living situation was proper.**

---

[265]R. at 18.
[266]Pl. Mot. at 10, dkt. 11.
[267]*Id.* at 11.
[268]*Id.* at 10.
[269]*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).
[270]R. at 17-18, 18-19.
[271]*Young*, 362 F.3d at 1001.

Ms. Jones finally argues, without citing any authoritative support, that the ALJ erred by relying on the ME's testimony that living in a large homeless shelter was indicative of less limited social functioning.[272] However, this issue is outside the scope of our review, since Ms. Jones is asking us to re-weigh evidence that the ALJ considered. As previously stated, weighing the evidence is the ALJ's role, not this Court's.[273] We will only overturn the ALJ's findings if they were erroneous or not supported by substantial evidence.

SSA regulations require that the ALJ evaluate all the evidence in a claimant's record before making a disability determination, including evidence outside of the objective medical record.[274] Ms. Jones suggests that living at a homeless shelter "is indicative of severe psychopathology" attempting to discredit the ME's "unjustified conclusion" that it was "evidence of less than marked social difficulties."[275] However, the ALJ balanced two important facts in this case: (1) that Ms. Jones lives in a homeless shelter and (2) that there is no objective evidence in the record of Ms. Jones getting into altercations with the many other residents at the shelter, despite her history of aggression with others. This analysis supports her finding that Ms. Jones does not have marked difficulties in social functioning.[276] Because there is substantial evidence to support the ALJ's finding, we find no error.

## IV.     CONCLUSION

For the reasons set forth above, the Commissioner's motion for summary judgment is granted [dkt. 13] and Ms. Jones' motion is denied [dkt. 11]. Her denial of disability benefits is upheld.

---

[272]Pl. Mot. at 11, dkt. 11.
[273]*Young*, 362 F.3d at 1001.
[274]20 C.F.R. § 404.1520(b).
[275]Pl. Mot. at 11, dkt. 11.
[276]R. at 15, 16-17.

**IT IS SO ORDERED**.

_____
Susan E. Cox
United States Magistrate Judge

Date: <u>October 10, 2012</u>